# ST. LOUIS AND SAN FRANCISCO RAILWAY COMPANY *v.* GILL.

### ERROR TO THE SUPREME COURT OF THE STATE OF ARKANSAS.

No. 173. Argued January 24, 1895. — Decided March 4, 1895.

A special statutory exemption or privilege (such as immunity from taxation or a right to fix and determine rates of fare) does not accompany the property of a railroad company in its transfer to a purchaser, in the absence of an express direction in the statute to that effect.

When a state legislature establishes a tariff of railroad rates so unreasonable as to practically destroy the value of the property of companies engaged in the carrying business, courts of the United States may treat it as a judicial question, and hold such legislation to be in conflict with the Constitution of the United States, as depriving the company of its property without due process of law, and as depriving it of the equal protection of the laws.

*Railroad Commission Cases,* 116 U. S. 307 ; *Dow* v. *Beidelman,* 125 U. S. 681; *Chicago, Milwaukee &c. Railway* v. *Minnesota,* 134 U. S. 418 ; *Chicago & Grand Trunk Railway* v. *Wellman,* 143 U. S. 339 ; and *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, examined in detail.

When, by legislation and consolidation, a railroad which was originally all in one State becomes consolidated with other roads in other States, and the State originally incorporating it enacts laws to regulate the rates of the consolidated road within its borders, the proper test as to the reasonableness of these rates is as to their effect upon the consolidated line as a whole.

When a State prescribes rates for a railroad, only a part of which is within its borders, the company may raise the question of their reasonableness by way of defence to an action for the recovery of penalties for violating the directions.

On the 16th day of August, 1880, under the general laws of the State of Arkansas, a company was incorporated under the name and style of the St. Louis, Arkansas and Texas

Railway Company, and authorized to construct a railway from the northern boundary of the State of Arkansas to Fayetteville, in that State. This railroad was connected at its northern terminus with the railroad of the St. Louis, Arkansas and Texas Railway Company, a corporation of the State of Missouri, and at its southern terminus with the railroad of the Missouri, Arkansas and Southern Railway Company, a corporation of the State of Arkansas.

Under provisions of the laws of the States of Arkansas and Missouri, on the 10th day of June, 1881, the three companies mentioned were consolidated into a single corporation, under the style of the St. Louis, Arkansas and Texas Railway Company, consolidated.

On and previous to. the 21st day of February, 1882, it was provided by the laws of the States of Arkansas and Missouri that any railroad company incorporated under the laws of the State of Missouri might .lease or purchase any part of a railroad with all its rights, privileges, immunities, real estate, and other property, the whole or a part of which was in the State of Missouri, and constructed, owned, or leased by any other company, .if the lines of the roads of said companies were connected and continuous, and that any railroad company incorporated under the laws of the State of Arkansas, whose road was wholly or in part constructed and in operation, was authorized to sell, lease, or otherwise dispose of the whole or any part of its railroad, with all the rights, privileges, franchises, and immunities thereunto belonging, to any connecting railroad or any railroad corporation then or thereafter organized under the laws of the State of Missouri, or of the United States, or of both.

In the manner provided by those laws, the St. Louis, Arkansas and Texas Railway Company, consolidated, on the 21st day of February, 1882, sold and conveyed all of its railway in the States of Arkansas and Missouri, together with all its rights, privileges, franchises, and immunities, to the St. Louis and San Francisco Railway Company, a corporation organized under the general laws of the State of Missouri and under several acts of the Congress of the United States.

By an act of the legislature of Arkansas, approved April 14, 1887, the maximum rate of passenger fares to be charged in that State was fixed at three cents per mile, and a penalty of $300 was given the passenger for each overcharge. At the fall term of 1887 of the Washington County Circuit Court, John B. Gill brought an action against the St. Louis and San Francisco Railway Company, alleging that said company, operating a railroad within the State of Arkansas more than seventy-five miles in length, had on five distinct occasions charged and received from the plaintiff more than three cents per mile, and demanding judgment for the penalties prescribed in the said statute.

The St. Louis and San Francisco Railway Company filed several pleas or special answers to the complaint, two of which are alleged to raise Federal questions. To these special pleas the plaintiff demurred, and the demurrers were sustained. The defendant then made several offers tending to show that the rate of three cents per mile for each passenger carried was unreasonable and did not enable the defendant to pay its interest or to earn anything on its capital stock. These offers were ruled out, on plaintiff's objection, as incompetent and irrelevant. Due exceptions were taken by the defendant to the action of the court in sustaining the demurrers and in excluding plaintiff's evidence. Judgment went for the plaintiff, which was on appeal affirmed by the Supreme Court of Arkansas, to whose judgment a writ of error was sued out to this court.

*Mr. Edward D. Kenna* for plaintiff in error. *Mr. George R. Peck, Mr. A. T. Britton,* and *Mr. A. B. Browne* were on his brief.

*Mr. A. H. Garland* for defendant in error. *Mr. D. W. Jones* and *Mr. J. H. Hill* were on his brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

By the act of April 4, 1887, the legislature of Arkansas prescribed a maximum rate of three cents per mile for each passenger carried by the railroads of that State, and a penalty of three hundred dollars for each overcharge, payable to the passenger from whom such overcharge had been exacted.

It was found by the trial court, a jury having been waived, that John B. Gill, the plaintiff, had, on several occasions, while travelling on the railroad of the St. Louis and San Francisco Railway Company, between points within the territory of the State of Arkansas, been charged a rate in excess of that allowed by the statute. The defendant company set up, by way of defence, that it operated that portion of the railroad on which the plaintiff travelled as a purchaser and assignee of the St. Louis, Arkansas and Texas Railway Company, a corporation organized under the laws of the State of Arkansas; that, under the laws of Arkansas in force at the time of the incorporation of said last-mentioned company, in April, 1880, it had the right to fix and regulate the rate of charge for carrying passengers, not to exceed the sum of five cents per mile; that the legislature might from time to time, reduce the rates, but that the same should not be so reduced as to produce, as profits for the railroad company, less than fifteen per cent per annum on the capital actually paid in; and that until such profits did annually accrue to said company, it and its successors and assigns were entitled, without limitation, restriction, or control, to the right to fix such rates of fares as to it should seem proper, not exceeding the rate of five cents per mile; that such provisions of the law constituted a contract between the St. Louis, Arkansas and Texas Railway Company and the State, and that the St. Louis and San Francisco Railway Company having become, in a manner and form provided by the laws of the State, the assignee of the St. Louis, Arkansas and Texas Railway Company, and the owner of its road, franchise, and privileges, had succeeded to its right to charge passenger rates not in excess of five cents per mile, so long as its profits did not exceed fifteen per cent per annum on the capital actually paid in; that the said railroad, although completed for about five years, had never earned in profits an

amount equal to three per cent on the capital actually paid in; that the net earnings or profits for the next ensuing two years will not exceed three per cent on the capital actually paid in or on the amount actually expended in the construction of said railroad; that the consolidation of the St. Louis, Arkansas and Texas Railway Company of Arkansas with the company of the same name, incorporated in Missouri, and the sale by the company so formed of its railroad to the defendant, each severally became and were compacts made between the States of Missouri and Arkansas with each other, with the consolidated company, and with the defendant company, respectively; that the act of April, 1887, of the legislature of Arkansas, attempting to fix passenger rates at less than five per cent per mile, in so far as it relates to the defendant's line of railway, never received the assent of the State of Missouri or of the defendant company, and that such enactment was an alteration and impairment of a contract, and as such null and void under the provisions of the Constitution of the United States.

To this plea or special answer the plaintiff demurred.

As a further plea or special answer the defendant company alleged, in connection with a history of the formation of the original companies, their consolidation, and the purchase of the consolidated railroad by the defendant, that, by a provision of the constitution of the State of Arkansas, in force at the time of the transactions narrated, it was provided that no charter of any corporation should be altered, annulled, or repealed in such a manner as to do injustice to the corporators; that the owners of the capital stock of the St. Louis, Arkansas and Texas Railway Company are the same and identical persons who own the capital stock of the defendant company; and that, if the rates of fare prescribed by the act of April, 1887, are enforced, the defendant company will not be able to earn a reasonable rate of interest on its indebtedness, or to meet the actual cost of transporting passengers and maintaining said division of its road; and that, therefore, said act of April, 1887, as far as it is applicable to the said railroad, is in violation of the constitution of Arkansas, and is unreasonable, and a taking of private property for public use without com-

pensation, and is therefore in violation of the Fifth and Four-teenth Amendments to the Constitution of the United States.

The plaintiff demurred likewise to this plea, and the demur-rers having been sustained, the defendant then offered to show that the St. Louis, Arkansas and Texas Railway Com-pany had, on December 31, 1880, executed bonds to the amount of $600,000 and secured the same by a mortgage of all its property, franchises, and immunities to the United States Trust Company of New York, which bonds were yet wholly due and unpaid, and upon which the defendant was required to annually pay the sum of $36,000 as interest; that the defendant company has never, since the construction of said lines, been able to earn, from all sources, an amount, which, after paying for the actual expenditures, would yield to the defendant or to the original incorporators a profit equal to one per cent upon the capital stock actually paid in cash and used in the construction of such lines of railroads; that the actual cost of transporting each passenger over that portion of the defendant's railway in the plaintiff's petition mentioned exceeded the sum of three cents per mile; that at the times in plaintiff's petition mentioned the defendant could not actually perform the service of carrying the plaintiff or any other passenger over its railway for the sum of three cents per mile, but that the sum in cash which it was actually required to expend in the carriage of said plaintiff and other passengers was equal to three and three-tenths cents for each and every mile such passenger was carried, and that if defend-ant was required to perform the service at the rate of three cents per mile, it would be required to expend more money in cash for the performance of such service than it would receive from the passenger, and that the revenue or income which it would receive from all sources of profit other than the passenger traffic would not be sufficient to enable it to make good the amount which it would lose on its pas-senger business; that three cents per mile for the service rendered by the defendant in carrying passengers, at the times in plaintiff's petition mentioned, over the line of rail-road therein described, was not reasonable compensation, and

that no less than five cents per mile would be a reasonable sum or one that would be just to the defendant; that defendant never had, since the construction or completion of said lines of railway, been able to earn from all its sources of revenue an amount which, after paying for the actual cash expenditures necessary for the operation of its road, would yield a profit equal to one per cent upon the actual cash cost of said road, which amounted to over $40,000 for every mile of railway constructed.

To this evidence the plaintiff objected as incompetent and irrelevant; the objection was sustained, and the defendant excepted to the action of the court in sustaining the demurrers and in rejecting the said offers of evidence. There was judgment for the plaintiff from which the defendant appealed to the Supreme Court of Arkansas, from whose judgment, affirming that of the court below, a writ of error was allowed to this court.

The plaintiff in error bases its demand that the judgment of the Supreme Court of Arkansas should be reversed, on two propositions, first, that the act of April, 1887, as applied to the defendant's railroad, was a violation of a contract between the State of Arkansas and the various corporations which constructed or subsequently acquired the line of railway in question; and, second, that, as the act, as applied to the defendant's railroad, requires the defendant to do business at a positive loss, it therefore constitutes a taking of defendant's property without just compensation or due process of law.

The first proposition requires the plaintiff in error to show that there existed a contract between the State of Arkansas and the St. Louis, Arkansas and Texas Railway Company, which, under the existing facts, forbade the application of the act of 1887 to the business of that company, and that the plaintiff in error, the St. Louis and San Francisco Railway Company, succeeded to such contract right.

As already stated, the constitution of Arkansas contained, when the St. Louis, Arkansas and Texas Railway Company was organized, a provision that the general assembly should have the power to alter, revoke, or annul any charter of incorporation then existing, or that might thereafter be created,

whenever, in their opinion, it might be injurious to the citizens of the State; in such manner, however, that no injustice should be done to the corporators. The law under which the St. Louis, Arkansas and Texas Railway Company was organized provided that the legislature might, when any such railroad should be opened for use, from time to time, alter or reduce the rates of toll, fare, freights, or other profits upon such road; but the same should not, without the consent of the corporation, be so reduced as to produce with said profits less than fifteen per cent per annum on the capital actually paid in; nor unless, on an examination of the amounts received and expended, to be made by the secretary of State, he should ascertain that the net income derived by the company, from all sources, for the year then last past, had exceeded an annual income of fifteen per cent upon the capital of the corporation actually paid in.

The contention is that, if the facts show that the company has not earned fifteen per cent per annum on the capital actually paid in, the State is precluded, notwithstanding the power reserved in the constitution, from reducing the rates or charges.

The Supreme Court of the State, 54 Arkansas, 101, as we learn from the record in this case, was of the opinion that the power to alter and amend charters, reserved to the State in its constitution, was not parted with or controlled by the subsequent act of the legislature incorporating the railroad company and authorizing it to establish rates, and that accordingly the passage of a subsequent general law, prescribing rates, could not be deemed an infringement of a contract between the State and the company.

We do not find it necessary to express an opinion on this view of the case, but prefer to base our judgment on another ground, which will bring us to the same result. It has been frequently decided by this court that a special statutory exemption or privilege, such as immunity from taxation or a right to fix and determine rates of fare, does not accompany the property in its transfer to a purchaser, in the absence of express direction to that effect in the statute. *Morgan* v. *Louisiana*, 93 U. S. 217; *Wilson* v. *Gaines*, 103 U. S. 417; *Chesapeake & Ohio Railway* v. *Miller*, 114 U. S. 176.

We find here no such express statutory direction, nor is there any equivalent implication by necessary construction. As is said in the decision of the Supreme Court of Arkansas in the present case: " The corporations owning the several parts of the road as to which it is chårged that the act operates unjustly were dissolved years before it was passed. As to them it could not operate unjustly, and in their behalf no cause of complaint can exist."

These considerations dispose of the proposition that the act of April, 1887, if made to apply to the railroad of the plaintiff in error, would operate as a violation of a contract subsisting between the State of Arkansas and the St. Louis and San Francisco Railway Company.

We are thus brought to the second proposition relied on by the plaintiff in error, that, as the act, when applied to the defendant's railroad, requires the company to do business at a positive loss, it therefore constitutes a taking of defendant's property without due process of law.

Whether, if the power of the State to fix and regulate the passenger and freight charges of railroad corporations has not been restricted by contract, there can be found, by judicial inquiry, a limit to such power in the practical effect its exercise may have on the earnings of the corporations, presents a question not free from difficulty. Given the case of a general law prescribing rates to all companies, can the courts inquire whether such rates are reasonable, and may they find that as to one company the prescribed rates permit it to do business at a prófit, and as to another, whose facilities are inferior, or where expenditures are greater, the rates afford no prófit? And will the fate of the law, as to its validity, depend, in each case, on the result of such an inquiry ?

This court has declared, in several cases, that there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destróy the value of property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the Constitution of the

United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws. *Railroad Commission Cases,* 116 U. S. 307, 331; *Dow* v. *Beidelman,* 125 U. S. 681; *Chicago, Milwaukee &c. Railway* v. *Minnesota,* 134 U. S. 418; *Chicago & Grand Trunk Railway* v. *Wellman,* 143 U. S. 339; *Reagan* v. *Farmers' Loan and Trust Co.,* 154 U. S. 362.

The so-called *Railroad Commission Cases,* 116 U. S. 307, arose under an act of the State of Mississippi passed March 11, 1884, which created a railroad commission, and charged it with the duty of supervising railroads, and particularly with the duty of revising the tariff of charges. The Mobile and Ohio Railroad Company had been theretofore incorporated by a charter which granted to it " the right from time to time to fix, regulate, and receive the tolls and charges by them to be received for transportation." A bill was filed by the Farmers' Loan and Trust Company, a New York corporation, to enjoin the railroad commission from enforcing against the Mobile and Ohio Railroad Company the provisions of the railroad commission act, and averring that the complainants were the trustees in a mortgage that had been executed prior to said act, and that the enforcement of the latter would impair their security.

The court held, two justices dissenting, that the statute incorporating the company did not deprive the State of its power, within the limits of its general authority, to act upon the reasonableness of the tolls and charges so fixed and regulated, and reversed the decree of the Circuit Court which had granted an injunction as prayed for in the bill. We now refer to this case for the purpose of calling attention to the facts that the act provided that proceedings to enforce its provisions were to be instituted by the commission, and that the suit was in form a bill in equity to restrain the commission from applying the terms of the act to the Mobile and Ohio Railroad Company.

The case of *Chicago Railway Co.* v. *Minnesota* was a writ of error to review a judgment of the Supreme Court of Minnesota, awarding a writ of mandamus against the railway company. The State of Minnesota by an act, approved March 7,

1887, had established a railroad and warehouse commission, providing that the rates of charge for the transportation of property published by the commission should be final and conclusive as to what are equal and reasonable charges, and that there should be no judicial inquiry as to the reasonableness of such rates; and the railroad company contended that the rates prescribed by the commission were unreasonable, and that, as the company was not permitted to put in testimony as to the reasonableness of such rates, the act was in conflict with the Constitution of the United States, as depriving the company of its property without due process of law, and by depriving it of the equal protection of the laws. As heretofore stated, the company's position was sustained, and the decree of the Minnesota court awarding the writ of mandamus was reversed. But it will be observed that the State was represented by the commission, and that the remedy went to the validity of the legislation as affecting the railroad company's business as a whole. It was not a suit between the company and an individual customer. Mr. Justice Miller, in his concurring opinion, said : " Until the judiciary has been appealed to to declare the regulation made, whether by the legislature or by the commission, voidable for unreasonableness, the tariff of rates so fixed is the law of the land, and must be submitted to both by the carrier and the parties with whom he deals; that the proper, if not the only, mode of judicial relief against the tariff of rates established by the legislature or by its commission is by a bill in chancery asserting its unreasonable character and its conflict with the Constitution of the United States, and asking a decree of the court forbidding the corporation from exacting such fare as excessive, or establishing its rights to collect the rates as being within the limits of just compensation for the service rendered; that until this is done it is not competent for each individual having dealings with the carrying corporation, or for the corporation with regard to each individual who demands its services, to raise a contest in the courts over the questions which ought to be settled in this general and conclusive method; and that, in the present case, where an application is made to the Supreme Court of the State to com-

pel the railroad companies to perform the services which their duty requires them to do for the general public, which is equivalent to establishing by judicial proceedings the reasonableness of the charges fixed by the commission, I think the court has the same right and duty to inquire into the reasonableness of the tariff of rates established by the commission before granting such relief, that it would have if called upon so to do by a bill in chancery."

*Chicago Railway Company* v. *Wellman*, 143 U. S. 339, was a contest over the validity of an act of the legislature of Michigan, passed in June, 1889, fixing the amount per mile to be charged by railways for the transportation of passengers. On the very day the law took effect, to wit, October 2, 1889, one Wellman went to the railroad company's office in Port Huron, and tendered for a ticket from that place to Battle Creek the sum of $3.20 instead of $4.80, which had been the regular fare. This was refused, and Wellman immediately brought an action for damages, and recovered a judgment for $101, an amount sufficient to take the case to a higher court; and ultimately the Supreme Court of Michigan affirmed the judgment sustaining the validity of the law. But the observations of this court by Mr. Justice Brewer are very pertinent to the present case. After stating the facts of the case, he said: "Can it be, under these circumstances, that the court erred in peremptorily refusing to instruct the jury that an act fixing a maximum rate at two cents per mile is unconstitutional? Is the validity of a law of this nature dependent upon the opinion of two witnesses, however well qualified to testify? Must court and jury accept their opinion as a finality? Must it be declared, as a matter of law, that a reduction of rates necessarily diminishes income? May it not be possible, indeed does not all experience suggest the probability, that a reduction of rates will increase the amount of business, and therefore the earnings?" And referring to the following observation made by the Supreme Court of Michigan in passing upon the case: "In the stipulation of facts or in the taking of testimony in the court below neither the attorney general nor any other person interested for or employed in

behalf of the people of the State took any part. What difference there might have been in the record had the people been represented in the court below, however, in our view of the case, is not of material inquiry," Mr. Justice Brewer added : "We think there is much in the suggestion. The theory upon which, apparently, this suit was brought is that parties have an appeal from the legislature to the courts; and that the latter are given an immediate and general supervision of the constitutionality of the acts of the former. Such is not true. Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented the validity of any act of any legislature, state or Federal, and the decision necessarily rests on the competency of the legislature so to enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between parties. It was never thought that by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act. . . . Our suggestion is only to indicate how easily courts may be misled into doing grievous wrong to the public, and how careful they should be not to declare legislative acts unconstitutional upon agreed and general statements, and without the fullest disclosure of all material facts."

Similar observations may be found in *Dow* v. *Beidelman,* 125 U. S. 680, a case wherein the validity of the very act now in question was assailed, and where this court affirmed the judgment of the Supreme Court of Arkansas sustaining the act. In that case the action had been brought by a passenger claiming penalties because he was charged more than the statutory rates, and the case went off on an agreed statement of facts, and it was said in this court, by Mr. Justice Gray : " The plaintiffs in error do not contend that it is always or generally unreasonable to restrict the rate for carrying each passenger to three cents a mile. They argue that it is so in this

case, by reason of the admitted facts, that with the same traffic that their road now has, and charging for transportation at the rate of three cents per mile, the net yearly income will pay less than one and a half per cent on the original cost of the road, and only a little more than two per cent on the amount of its bonded debt. But there is no evidence whatever as to how much money the bonds cost, or as to the amount of the capital stock of the company as reorganized, or as to the sum paid for the road by that corporation or its trustees. It certainly cannot be presumed that the price paid at the sale under the decree of foreclosure equalled the original cost of the road, or the amount of outstanding bonded debt. Without any proof of the sum invested by the reorganized corporation or its trustees, the court has no means, if it would under any circumstances have the power, of determining that the rate of three cents a mile fixed by the legislature was unreasonable. Still less does it appear that there has been any such confiscation as amounts to a taking of the property without due process of law."

*Reagan* v. *Farmers' Loan and Trust Co.*, 154 U. S. 362, is the last case to which we deem it necessary to refer. The principal facts of the case were these: In April, 1891, the legislature of Texas passed an act establishing a railroad commission with power to classify and regulate rates. After the commission was organized it proceeded to establish certain rates for the transportation of goods over the railroads in the State. Thereafter, in April, 1892, the Farmers' Loan and Trust Company of New York filed a bill in the Circuit Court of the United States for the Western District of Texas, making as defendants the railroad commissioners, the attorney general, and the International and Great Northern Railroad Company. The bill alleged that the complainant was the trustee in a mortgage on said railroad to secure a series of bonds, and averred generally that the rates fixed by the commission were unreasonable and unjust, and set forth certain specific facts which it claimed established the injustice and unreasonableness of those rates, and prayed a decree restraining the commission from enforcing those rates or any other

rates, and also restraining the attorney general from instituting any suits to recover penalities for failing to conform to such rates. The International and Great Northern Railroad Company appeared, filed an answer, and also a cross-bill similar in its scope and effect to the bill filed by the plaintiff, and praying substantially the same relief. The commission and the attorney at first filed answers, which they subsequently withdrew and filed demurrers, leave being given at the same time to the complainant and cross-complainant to amend the bill and cross-bill before the filing of the demurrer. The amendments contained allegations in considerable detail of the losses in revenue sustained by the company through the enforcement of the statutory rates, and the average reduction caused thereby in the rate theretofore existing.

The Circuit Court entered a decree granting the injunctions as prayed for, restraining and forbidding the commission from enforcing the established rates, and from making or publishing any other or further rates.

The opinion of this court on appeal was that while it was within the power of a court of equity in such case to decree that the rates so established by the commission were unreasonable and unjust, and to restrain their enforcement, it was not within its power to establish rates itself, or to restrain the commission from again establishing rates.

After recognizing the previous cases as establishing the proposition that, while it is not the province of courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of freights, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property, the court proceeded to consider and discuss the question whether the rates prescribed by the commission were unjust and unreasonable. Upon reading the opinion it is obvious that the principal difficulty encountered was whether the facts alleged in the bill and cross-bill, conceded by the demurrers to be true, furnished the court sufficient evi-

dence to enable it to find, as a judicial conclusion, that the statutory rates were unreasonable; and Mr. Justice Brewer, who delivered the opinion of the court, after reciting a broad allegation in the bill, said: "It may not be just to take this as an allegation of a mere matter of fact, the truthfulness of which is admitted by the demurrer, and which, as thus admitted, eliminates from consideration all questions as to the true character and effect of the rates, yet it is not to be ignored. There are often in pleadings general allegations of mixed law and fact, such as the ownership of property and the like, which, standing alone, are held to be sufficient to sustain judgments and decrees, and yet are always regarded as qualified, limited, or even controlled by particular facts stated therein. It would not, of course, be tolerable for a court of equity to seize upon a technicality for the purpose or with the result of entrapping either of the parties before it. Hence, we should hesitate to take the ffling of the demurrers to these bills as a direct and explicit admission on the part of the defendants that the rates established by the commission are unjust and unreasonable. It must be noticed that at first answers were filed, tendering issue upon the matters of fact, and testimony was taken, the extent of which, however, is not disclosed by the record. After that the defendants applied for leave to withdraw their answers and file demurrers. It is not to be supposed that this was done thoughtlessly. But one conclusion can be drawn from that action, and that is, that upon the taking of the testimony defendants became satisfied that the particular facts were as stated in the bills, and that the conclusions to be drawn from such facts could not be overthrown by any other matters. Hence, if it appears that the facts stated in detail tend to prove that the rates are unreasonable and unjust, we must assume, as against the demurrers, that the general allegation heretofore quoted is true, and that there are no other and different facts which, if proved, might induce a different conclusion, and compel a different result."

As already stated, the defendant's railway was composed by consolidation of one incorporated in Missouri and of two incorporated in the State of Arkansas. The allegations con-

tained in the fourth answer of the railroad company have reference to that part of the defendant's railroad that originally belonged to the St. Louis, Arkansas and Texas Railway Company, incorporated under the laws of the State of Arkansas. Those allegations were to the effect that such portion of the railroad was traversed by the plaintiff below, and was highly expensive to construct and maintain, and that the cost of transporting passengers over said division and the maintenance thereof exceed the maximum fixed by the act of 1887. The offers of evidence we also understand, notwithstanding their general terms, to have been intended to sustain the allegations contained in the fourth answer, and not to be applicable to the company's entire railroad. Thus one of the offers was to show that " the actual cost of carrying each passenger over that portion of defendant's railway in plaintiff's petition mentioned, and over all its railway therein referred to, did and does now exceed the sum of three cents per mile for each and every passenger so carried," and another was to show that " three cents per mile for the service rendered by defendant in carrying passengers, at the times in plaintiff's petition mentioned, over the line of railroad therein mentioned, was not reasonable compensation, and that no less than five cents per mile would be a reasonable sum."

It therefore appears that the allegations made and the evidence offered did not cover the company's railroad as an entirety even in the State of Arkansas, but were made in reference to that portion of the road originally belonging to the St. Louis, Arkansas and Texas Railway, and extending from the northern boundary of Arkansas to Fayetteville in said State. In this state of facts we agree with the views of the Supreme Court of Arkansas, as disclosed in the opinion contained in the record, and which were to the effect that the correct test was as to the effect of the act on the defendant's entire line, and not upon that part which was formerly a part of one of the consolidating roads; that the company cannot claim the right to earn a net profit from every mile, section, or other part into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such

part would be unremunerative ; that it would be practically impossible to ascertain in what proportion the several parts should share with others in the expenses and receipts in which they participated ; and, finally, that to the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated as against all its legitimate expenses under the operation of the act within the limits of the State of Arkansas.

Sometimes in acting on this subject the state legislatures have created commissions or boards of public works, with power to establish rates for the transportation of passengers and freight, and in such instances the course recommended by Mr. Justice Miller, already cited, may well be followed ; that the remedy for a tariff alleged to be unreasonable should be sought in a bill in equity or some equivalent proceeding, wherein the rights of the public as well as those of the company complaining can be protected.

But there are other cases, and the present is one, where the legislatures choose to act directly on the subject by themselves establishing a tariff of rates and prescribing penalties. In such cases there is no opportunity to resort to a compendious remedy, such as a proceeding in equity, because there is no public functionary or commission which can be made to respond, and therefore, if the companies are to have any relief it must be found in a right to raise the question of the reasonableness of the statutory rates by way of defence to an action for the collection of the penalties.

However, we have seen that, in the present case, the evidence failed, in that it was restricted to a part only of the railroad, and that even if the evidence could be understood as applicable to the entire line in Arkansas, there was no finding of the facts necessary to justify the courts in overthrowing the statutory rates as unreasonable, but that, on the contrary, the company's case depended on allegations admitted by the demurrer of a party who, in no adequate sense, represented the public ; and, upon the whole, we do not feel warranted, by all that appears in this record, in declaring invalid an act of the

legislature of Arkansas, which on its face appears to be a legitimate exercise of power, and which has not been shown, by clear and satisfactory evidence, to operate unjustly and unreasonably, in a constitutional sense, against the plaintiff in error.

The judgment of the Supreme Court of Arkansas is accordingly                                                                *Affirmed.*

---

ST. LOUIS AND SAN FRANCISCO RAILWAY COMPANY *v.* STEVENSON, No. 174; SAME *v.* TRIMBLE, No. 175; SAME *v.* CARTER, No. 176. These cases were argued with, and are similar in their facts to, the case of *St. Louis and San Francisco Railway Company* v. *John B. Gill,* No. 173, just decided, and are to be similarly disposed of. An additional fact, that a portion of the road travelled over consisted of a bridge, built under authority of an act of Congress, is made to appear, but as no point is made or argued in the brief of the plaintiff in error, and as we see in such fact nothing that would affect the result, the judgments of the Supreme Court of Arkansas in those cases are

*Affirmed.*

*Mr. Edward D. Kenna* for plaintiff in error.

*Mr. A. H. Garland* for defendant in error.