[No. 17689. *En Banc.* July 18, 1923.]

## NORTHERN PACIFIC RAILWAY COMPANY et al., *Appellants,* v. THE DEPARTMENT OF PUBLIC WORKS et al., *Respondents.*[1]

CARRIERS (3-3)—CONTROL AND REGULATION—REASONABLENESS OF RATES—EVIDENCE—BURDEN OF PROOF. Where the evidence showed *prima facie* that rates are discriminatory and unlawful, the burden of proof is upon the carrier to support their new proposed schedule, under Rem. Comp. Stat., § 10424, placing the burden upon a public service company at any hearing involving a change of rates.

SAME (3-3)—BASIS—AVERAGE PER TON MILE TO FIX COMMODITY—AVERAGE TRANSPORTATION COSTS ON DIFFERENT ROADS. Where four carriers serve practically the same territory and the carriers do not seriously object to a uniform distance tariff rate, if it is compensatory, it is not error to base the costs of transportation on the average transportation costs of all four roads, although the costs and revenue of one road would not be the same as of another.

SAME (3-3)—BASIS—AVERAGE PER TON MILE TO FIX COMMODITY RATE—INTERSTATE COSTS AS AFFECTING INTRASTATE RATES—TERMINAL AND BRANCH LINE OPERATION. It being impossible to determine the exact cost of transporting any one commodity or the exact ratio between initial and delivery costs and line haul costs, in fixing uniform distance tariffs on intrastate transportation of logs which move only over part of the state mileage and principally over branch lines, it is proper to consider the average cost of transportation of 1,000 tons per mile over the entire system; since the relations between intrastate and interstate commerce are interdependent, and the rate on branch lines cannot be determined by the revenue and expense on branch lines alone; especially where the branch line costs in this state are not out of proportion to other branch line costs, the expense of moving logs is approximately the same as that for any other traffic moving in large volumes, and more manufactured lumber is handled than the carriers are transporting in the form of logs.

SAME (3-3)—BASIS—PROFITS—DEDUCTION OF FEDERAL INCOME TAX. Rates fixed to allow a carrier a return of six per cent upon the investment, cannot be objected to because the income tax was not included as part of the operating expenses, where the rate allowed was sufficient to pay 5.75 per cent return, including the income tax as part of the operating expenses.

SAME (3-1)—REGULATION OF CHARGES—LOG RATES—REQUIRING EQUIPMENT—PATENT BUNKS. Under Rem. Comp. Stat., § 10345,

[1]Reported in 218 Pac. 507.

providing that carriers shall provide adequate equipment to safely
and properly transport property offered for transportation, the de-
partment of public works may fix rates penalizing a carrier for
failure to furnish logging cars equipped with patent bunks.

SAME (3-3, 3-4)—REASONABLENESS OF RATES—APPEAL AND REVIEW.
The findings of the department of public works as to the reason-
ableness of rates are controlling on the courts unless they have been
arbitrarily reached without full consideration of the facts or have
been arrived at upon a manifestly wrong basis; it not being within
the province of the courts to consider the weight of the evidence or
the wisdom of the order.

SAME (3-1, 3-3)—REASONABLENESS OF RATES—POWERS CONFERRED—
FIXING TEST PERIOD. In view of the difficulty of measuring the rea-
sonableness of rates by reference to the cost of transportation, it is
proper to determine the same by prescribing a test period for pro-
posed changes with a right to a rehearing at any time, if, in actual
operation, the rates prove oppressive or confiscatory.

MAIN, C. J., FULLERTON, and MACKINTOSH, JJ., dissent.

Appeal from a judgment of the superior court for
Thurston county, Wright, J., entered September 25,
1922, affirming, upon certiorari, an order of the depart-
ment of public works establishing intrastate freight
rates for logs, after a hearing on the merits. Affirmed.

*Thomas Balmer* and *Edwin C. Matthias,* for appel-
lant Great Northern Railway Company.

*H. A. Scandrett, A. C. Spencer, W. A. Robbins,* and
*Frank C. Owings,* for appellant Oregon-Washington
Railroad & Navigation Company.

*F. M. Dudley,* for appellant Chicago, Milwaukee &
St. Paul Railway Company.

*Geo. T. Reid, C. H. Winders,* and *L. B. da Ponte,* for
appellant Northern Pacific Railway Company.

*The Attorney General* and *Raymond W. Clifford,
Assistant,* for respondent Department of Public Works.

*John E. Belcher* and *Arthur Remington,* for respond-
ent Cady Logging Company.

*Lyle, Henderson & Carnahan,* amici curiae.

PEMBERTON, J.—The public service commission, now the board of public works, on its own petition, seeks to establish just and proper rates on logs within the state of Washington. The rates were originally established by the carriers themselves, and were discriminating and preferential and lacking in uniformity. On January 25, 1918, by order No. 28, the director general increased the freight rates twenty-five per cent throughout the United States. In the transportation act of February 28, 1920 (41 Stat. 456), providing for the termination of Federal control, Congress recognized the necessity for higher freight rates, and authorized the Interstate Commerce Commission to establish rates which would earn a fair return upon the value of the railway property. A fair return was declared to be five and one-half per cent of such aggregate value and one-half of one per cent for improvements. Under the power so granted and after an investigation, the Interstate Commerce Commission, on July 29, 1920, entered *Ex Parte* 74, found in 58 I. C. C. p. 220, in which the railways of the United States were divided into four groups, and increases in rates were allowed as follows: Eastern group, forty per cent; Southern group, twenty-five per cent; Western group, thirty-five per cent; Mountain Pacific group, twenty-five per cent.

The state of Washington being in the Mountain Pacific group and having an increase of twenty-five per cent, the public service commission, in cause No. 5092, for the sake of uniformity, to meet the critical emergency then existing, and to carry out the intent of the 1920 transportation act and the order of the Interstate Commerce Commission, granted an increase of twenty-five per cent on all intrastate freight rates, and called the attention of the carriers to the discriminatory

rates and directed the carriers to readjust the rates upon a proper basis.

No action having been taken by the carriers to adjust the rate, the public service commission filed its complaint charging that the rates, rules, regulations and charges were unreasonable, unjust, discriminatory, prejudicial and preferential, and ordered that hearings be had to determine what rates should be prescribed for the intrastate movement of logs within the state. After hearing the testimony, the department of public works entered its findings of fact and order establishing a uniform distance scale of rates for the intrastate transportation of logs within the state of Washington. The same was ordered to remain in effect during an experimental period of twelve months, or until further order of the department.

Being dissatisfied with the order of the board of public works, the carriers secured a writ of review from the superior court of Thurston county. That court, after a hearing, entered judgment affirming the order of the commission, from which judgment the carriers have prosecuted this appeal.

It is first contended that the court erred in holding that the carriers had the burden of proof. The record shows that there was sufficient evidence introduced to make a *prima facie* showing that the rates were discriminatory and unlawful, and the carriers were properly required to sustain the burden in support of their new proposed tariff No. 29, under § 10424, Rem. Comp. Stat. [P. C. § 5609], which provides as follows:

"At any hearing involving any change in any schedule, classification, rule or regulation the effect of which is to increase any rate, fare, charge, rental or toll theretofore charged, the burden of proof to show that the changed schedule, classification, rule or regulation, or the increased or proposed increased rate, fare,

charge, rental or toll is just and reasonable shall be upon the public service company."

It is contended that the board of public works erred in basing its findings upon the cost of transportation determined by an average of the transportation costs of the four appellant railroads; that, in determining what are fair, just, reasonable and sufficient rates for services by any carrier, the costs, revenues, etc., of that particular carrier must be considered, and not the average or combined costs and revenues of a number of carriers; that the department took, as a basis of its calculation of transportation costs, a unit operating cost supposed to represent the average unit cost upon four different systems, and then sought to determine upon that basis what rates were necessary to give to the individual carrier just, reasonable, and sufficient return for its services, and thus attempted to do that which was an impossibility in logic and prohibited by law.

It is admitted that the cost and revenue of one road would not be the same as the cost and revenue of another road. It is a fact, however, that the four carriers serve practically the same territory and they themselves submitted a uniform distance tariff rate. Railroads serving the same territory must have the same rate. Otherwise, the one having the lower rate would secure a larger portion of the traffic. The carriers would not seriously object to a uniform distance tariff rate if it would fully compensate them for their services. This objection will, therefore, be removed, if it is determined that the proposed rates are compensatory.

It is next contended that the department erred in basing its findings as to the cost of transportation of logs upon the average cost of transportation per ton mile upon the systems of the carriers. The mileage of

the carriers in the state of Washington, as found by
the department of public works, is about eighteen per
cent of the entire mileage, and the log traffic does not
move over all of the Washington mileage.

It is contended that the average system cost of trans-
portation of one thousand tons per mile is much below
the average cost of transportation of one thousand
tons per mile within the state of Washington, and still
farther below such cost upon divisions carrying the
great bulk of the logs.

It is admitted that it is impossible to determine the
exact cost of transporting any one commodity. It is
claimed that the most approved method of apportion-
ing the entire cost as between different commodities is
the car mileage or ton mile basis. The object is to
obtain, as accurately as possible, the actual cost of the
transportation. By including the entire system, there
is included the transportation of every commodity on
every part of the system. The transcontinental freight,
by virtue of its long haul, and the transportation with-
in the Mississipi valley where level grades prevail and
fuel is cheap, moves with comparative cheapness as
compared with the transportation in the state of Wash-
ington. And it is claimed that the use of such cost,
included in determining the system ton mile cost as
factors to determine the cost within the state of Wash-
ington, is inadmissible.

It is also claimed that the cost of all transportation
includes two factors: First, the cost of picking up and
delivering the freight at points of origin and destina-
tion known as the initial and delivery costs; and
second, the line haul; that the initial and delivery costs
are unaffected by the length of the haul; that the cost
per ton mile increases as the length of haul decreases.
It is admitted, however, that the exact ratio between

initial and delivery costs and line haul costs has not been determined.

Respondent claims that the branch lines and expense incurred thereon are peculiarly a feature of terminal division operation; that their existence is essential to afford sufficient volume of traffic to render main line operation possible and profitable; that the intrastate commerce is essentially an aggregation of short hauls, while interstate commerce predominates in transcontinental movements; that, so far as revenues are concerned, the carriers recognize the composite character of the freight receipts in any state, and by mileage assignments spread these receipts, which flow from the operation as a whole over the entire system, and insists that the expense particularly incurred within the state of Washington in interstate assembly and distribution should be extended over the entire system.

It must be conceded that intermediate divisions of transcontinental systems, where such divisions originate little traffic, would be almost devoid of traffic were it not for originating and terminal divisions, and the relations between intrastate and interstate commerce are interdependent, so far as receipts and expenses are concerned; that the Washington branch line costs are not out of proportion to other branch line costs, and that the expense of moving logs is approximately the same as that for any other traffic moving in large volumes.

The board found, also, that as a whole more manufactured lumber is being handled by the carriers than the carriers are transporting in the form of logs.

The rate on a branch line cannot be determined by the revenue and expense of operation upon the branch line alone, since such a rate would be prohibitive. The relation of a branch line to the main line is valuable in

originating and delivering traffic to and from the main line, as stated in the case of *St. Louis and San Francisco R. Co. v. Gill,* 156 U. S. 649, 39 L. Ed. 567, wherein the court said:

"The company cannot claim the right to earn a net profit from every haul, section, or other part into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such part would be unremunerative."

And in the case of *Chesapeake & Ohio R. Co. v. Public Service Comm.,* 83 S. E. (W. Va.) 288, the supreme court of West Virginia said:

"While the line in question may not and perhaps will not as a segment yield a net profit to the operator on the passenger traffic, it will serve as a feeder to the main lines, and add a valuable increment to the gross returns of the system."

We are satisfied that the board of public works proceeded upon a fundamentally right basis in determining that the costs of the entire system should be taken into consideration in determining the cost in the state of Washington, since interstate and intrastate commerce are interdependent upon each other. One could not exist extensively without the other.

The fourth assignment, addressed to finding No. 12, claims error by reason of the fact that the income tax is not included as part of the operating expenses in estimating the net income in preserving to the carriers six per cent return upon the amount invested. The Interstate Commerce Commission, in its rate reduction order of May 16, 1922 (68 I. C. C. 676), in which it determined that five and three-quarters per cent of the aggregate value of the railway property of carriers would constitute a fair return thereon and after March 1, 1922, amending *Ex Parte* 74, 58 I. C. C. 220, allowing six per cent, found as follows:

"We may observe that a fair return of 5.75 per cent, representing an aggregate annual net railway operating income arrived at after deducting, among other things, the Federal income tax on a return of 6 per cent, would be approximately the equivalent of a fair return of 6 per cent, out of which the Federal income tax was payable."

The allowance of the board of public works of six per cent to the carrier is sufficient to pay the 5.75 per cent, including the income tax as part of the operating expenses.

It is contended that the department erred in prescribing a penalizing lower rate for failure to furnish cars equipped with patent bunks.

Section 9 of the public service law (ch. 117, Laws of 1911, pp. 546-547) provides as follows:

"Every common carrier shall construct, furnish, maintain and provide safe, adequate and sufficient service facilities, . . . and equipment to enable it to promptly, expeditiously, safely and properly receive, transport and deliver all persons or property offered to or received by it for transportation, and to promote the safety, health, comfort and convenience of its patrons, employees and the public." Rem. Comp. Stat., § 10345.

We are satisfied that, under this provision, the board of public works was authorized to direct that the carrier provide the log bunks as part of the equipment to enable the carrier to promptly, expeditiously, safely and properly receive, transport and deliver the logs.

The balance of the thirty-four assignments of error involve questions of fact, and these findings are controlling unless they have been arbitrarily reached without full and due consideration of all the facts or have been arrived at upon a manifestly wrong basis. We said in the case of *Puget Sound Elec. R. v. Rail-*

*road Commission,* 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B 763:

"The inquiry was of such a nature as to call largely for expert testimony, and the findings made are necessarily of the same nature. In such a case great consideration should be given the findings of that body to whom the state has primarily given the right and authority to determine questions of this character. Such findings should not be disturbed unless they bear evidence of having been arbitrarily reached and without a full and due consideration of all the controlling facts. Their determination calls for the exercise of economic as well as legal principles. Courts may well review the questions submitted, in so far as they suggest the application of legal principles. In so far as they suggest the enunciation of proper economic rules, they must defer largely to those who, by study, experience, and calling, are in a better situation to determine what is and what is not a proper method of determination."

We also said in *State ex rel. Great Northern R. Co. v. Public Service Comm.,* 76 Wash. 625, 137 Pac. 132:

"Such decisions are peculiarly within the province of the commission to make, and 'its findings are fortified by presumptions of truth due to the judgments of a tribunal appointed by law and informed by experience'. *Interstate Commerce Commission v. Chicago, R. I. & P. R. Co.,* 218 U. S. 88."

In this case, the board of public works has attempted to establish reasonable rates to supersede the discriminatory and unreasonable rates and, in its order, provides for a test period within which the reasonableness or unreasonableness of the rates can be established.

The difficulty in attempting to measure the reasonableness of the charges by reference to the cost of transportation is admitted, and the only true test is the actual operation under the proposed rates, and as

stated in *Landon v. Public Utilities Comm.*, 234 Fed. 152:

"It has frequently been the practice of courts when one came to it to ask such equitable relief as is here sought to require as a condition to listening to the application, that the rates fixed by the commission should be first tested, and then the matter should be determined as to whether or not they were confiscatory."

And in the case of *Des Moines Gas Co. v. Des Moines*, 238 U. S. 153, it was said:

"Nor do we think there was error in refusing an injunction upon the conclusion reached that a return of six per cent per annum on the valuation would not be confiscatory. This is especially true in view of the fact that the ordinance was attacked before there was opportunity to test its results by actual experience."

We find that the rule laid down in the case of *Northern Pac. R. Co. v. North Dakota*, 216 U. S. 579, 54 L. Ed. 624, is properly applicable to this case, wherein it was said:

"The great difficulty in the attempt to measure the reasonableness of charges by reference to the cost of transporting the particular class of freight concerned is well known and often has been remarked. It seems to us that the nearest approach to justice that can be made at this time is to follow the precedent of *Wilcox v. Consolidated Gas Co.*, 212 U. S. 19, as nearly as may be, and affirm the decree, but without prejudice to the right of the railroad company to reopen the case by appropriate proceedings if, after adequate trial, it thinks it can prove more clearly than at present the confiscatory character of the rates . . ."

We find that there is proper evidence to support the order of the board of public works. The court has not the authority or right to substitute itself for the rate-making body and attempt to perform such functions.

"Rate making is no function of the courts and should not be attempted either directly or indirectly." *New-ton v. Consolidated Gas Co.*, 258 U. S. 165. Neither is it within the province of the court to consider the weight of the evidence or wisdom of the order.

As stated by the supreme court of the United States in the case of *Akron, Canton & Youngstown R. Co. v. United States*, U. S. Adv. Ops. 1922-23, p. 308:

"To consider the weight of the evidence, or the wisdom of the order entered, is beyond our province."

The order complained of provides for an experimental period, and if the tariff is found by actual trial to be oppressive or confiscatory, a rehearing may be had at any time before the board of public works.

The judgment is affirmed.

PARKER and TOLMAN, JJ., concur.

BRIDGES and MITCHELL, JJ., concur in the result.

HOLCOMB, J. (concurring)—I cannot fully concur in all that is said in the foregoing opinion, believing that much of it is unnecessary; but do concur in the result, for the reason that the order of the board of public works did no more than provide a test period within which the reasonableness or unreasonableness of the rates adopted should be established. The court was therefore justified in doing what was stated in *Landon v. Public Utilities Comm.*, 234 Fed. 152,—require that the rates fixed by the commission be first tested, and then the matter be determined as to whether or not they proved confiscatory. This is exactly such a case. The carriers themselves could not determine definitely what, in every respect, should be considered as bases for rate making. In a case of such general public concern, and of such far-reaching importance to the carriers, nothing could be fairer than that an experimental

order, for a reasonable period, be made as was made by the department. The result is therefore right.

FULLERTON, J. (dissenting)—I am unable to agree with the conclusion reached by the majority in this cause. It is my opinion that the department of public works proceeded upon bases fundamentally wrong in fixing the rates the rail carriers involved may charge for transporting the commodity here under consideration. Some of the reasons for so concluding I will notice as briefly as I may.

The department, after reciting that the exhibits and calculations of the carriers showed a loss from the carriage of logs in the state of Washington at their present existing rates for the year 1920 (the year preceding the date of the hearing before the department), found that there had been an actual profit from the carriage of logs during the year named of $818,448. It reached this result by the following method—I quote from their findings:

"In arriving at the net revenue from log traffic earned by the four principal carriers within the state during 1920, of $818,448, the following method was used:

| | | |
|---|---|---|
| "Gross revenue from log transportation | $2,859,172 | |
| "Incidental freight revenue assigned to log transportation.. | 56,232 | |
| "Total revenue.............. | | $2,915,404 |
| "Operating expense assigned to log transportation........... | $1,923,198 | |
| "Taxes assigned to log transportation .................... | 173,758 | |
| "Total expense ............. | | $2,096,956 |
| "Total net ................. | | $818,448 |

"In arriving at the operating expense assigned to the log traffic, the cost of freight operation within the

State of Washington was calculated upon the basis of cost per 1,000 gross ton miles of handling all freight upon the combined systems of the four principal carriers, and in this manner the total cost of freight operation assignable to the State of Washington was found to be $38,678,870, which is equivalent to a unit operating cost of $5,321 per 1,000 revenue gross ton miles handled by the four principal carriers within the state during the year in question. On this basis the cost of handling the log traffic within the state during the year by such carriers was $1,923,198. The taxes assigned to the log traffic are one-half of those contended for by the carriers after the elimination of income taxes. All of the figures used in this calculation are contained in the annual reports filed with us by the carriers, or were taken from exhibits supplied by the carriers in this case."

It is my opinion that the department here erred in its method of procedure. The first reason for so concluding is that the department went too far afield in its search for a unit of measurement. The jurisdiction of the department to fix rates of carriage for either passengers or freight is confined solely to the intrastate traffic of the carriers. With their interstate traffic, or with their traffic in other states, it has nothing to do. The power to regulate such traffic is vested exclusively in other bodies with whom the department in this state has not even an advisory control. The conditions under which a carrier is permitted to conduct its traffic must always materially affect its cost. The number of trains it must run within a given time, the terminal facilities it must provide, the number of train operatives it is required to furnish, and like matters, all enter into the cost, and, as these are necessarily different in the different jurisdictions, any unit of measurement based upon the cost of hauling over the entire system cannot be a correct unit to measure the cost of

hauling a particular commodity in this state. In my opinion, the department should have confined its inquiries to the cost of haul of freight traffic within this state. This, as I understand it, is the rule announced by the supreme court of the United States in *Smyth v. Ames*, 169 U. S. 466. A quotation from the opinion will make the point clear. The court there used this language:

"It is further said, in behalf of the appellants, that the reasonableness of the rates established by the Nebraska statute is not to be determined by the inquiry whether such rates would leave a reasonable net profit from the local business affected thereby, but that the court should take into consideration, among other things, the whole business of the company, that is, all its business, passenger and freight, interstate and domestic. If it be found upon investigation that the profits derived by a railroad company from its interstate business alone are sufficient to cover operating expenses on its entire line, and also to meet interest, and justify a liberal dividend upon its stock, may the legislature prescribe rates for domestic business that would bring no reward and be less than the services rendered are reasonably worth? Or, must the rates for such transportation as begins and ends in the state be established with reference solely to the amount of business done by the carrier wholly within such state, to the cost of doing such local business, and to the fair value of the property used in conducting it, without taking into consideration the amount and cost of its interstate business, and the value of the property employed in it? If we do not misapprehend counsel, their argument leads to the conclusion that the State of Nebraska could legally require local freight business to be conducted even at an actual loss, if the company earned on its interstate business enough to give it just compensation in respect of its entire line and all its business, interstate and domestic. We cannot concur in this view. In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed

by a State for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the State has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the State that the State can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for, out of a common fund; and that its capitalization is on its entire line, within and without the State, can have no application where the State is without authority over rates on the entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business.''

See, also, the *Minnesota Rate Cases,* 230 U. S. 352, where the case is cited with approval upon this point.

Another reason for concluding that the department erred is that the rule adopted, if permissible, would furnish no just rule of measurement for hauling the particular commodity her in consideration. Some of the reasons for so concluding are these: The average length of haul for logs is, in the state of Washington, but little more than thirty miles; while the average

length of haul of general freight over the combined system of the railways involved is several hundred miles, and it is conceded that the cost of haul decreases as the length of haul increases. The rule takes no account of the difference in cost of hauling over the tortuous, winding, heavily graded road beds in the mountainous regions of Washington, and the cost of hauling over the straight and level road beds of the great plains of the middle West; yet this, also, is an element concededly affecting the cost. It takes no account of the difference in movement of empty cars between the hauling of logs and the hauling of general freight, although it was shown that rolling stock fitted for hauling logs can be used for no other purpose while so fitted, and that the consequent movement of empty cars is always greater in proportion to loaded cars than it is in the hauling of general freight; the percentage in the one case equalling fifty, while in the other it is about thirty-three and one-third. It takes no account of the cost of upkeep of the rolling stock; the percentage of breakage and damage to the rolling stock devoted to the log traffic being greater than it is in any other. The rule takes no account of the fact that the movement of logs in the state of Washington is principally upon branch lines—the ratio between branch and main lines being as 75 is to 25—and that the cost of haul upon branch lines is substantially twice as great per ton mile as it is upon main lines; and it takes no account of the somewhat abnormal number of empty cars required to originate one loaded car.

All these conditions were shown by the evidence, and, clearly, each of them tends to show that the cost of hauling logs in the state of Washington is greater per thousand gross ton miles than is the average cost of hauling general freight over the combined systems

of the railway companies. Indeed, a statistician of one of the railway companies presented somewhat elaborate tables by which he sought to show the cost of hauling on the lines of his company one thousand gross tons of logs one mile. His deductions were that the cost was $7.61 per mile as against $5.321 as found by the department. I quote his figures with more confidence since, as I understand the record, his method of deduction met with the approval of the distinguished traffic expert now in the employ of the department, and who has so ably and so long served the state in that capacity.

Another reason is that the department, in fixing its unit of haul, purposely excluded the federal taxes paid by the railway companies. That this is an expense necessarily to be taken into consideration was decided by the supreme court of the United States in *Galveston Electric Co. v. Galveston*, 258 U. S. 388.

The department was of the opinion that operation for a limited time under the rates fixed by it would of itself determine whether or not the rates were reasonable and just, and this seems to have been in some degree a controlling influnce with the majority of this court. But I am afraid this consideration is going to prove illusory. If the earnings under the present traffic rates do not prove the reasonableness of the cost of haul, I am unable to see how the earnings under a materially reduced rate are going to prove so. There is but one proper way to determine the reasonableness of the cost of haul, and that is, to take into consideration all of the elements that enter into the cost. The earnings from the haul is only one of such elements and, at the end of the probationary period, the department, it seems to me, is going to be confronted with the same problem that now confronts it. I concede, of

course, that had the order related to the entire intra-state traffic of the companies involved, their gross earnings from the combined traffic, compared with the gross cost of haul, would in some degree determine the reasonableness of the rates fixed. But the case here is not this. There is here a fixing of a rate upon a single commodity, and nothing but a general inquiry, which the department is as well prepared now to make as it will be after the test period, can determine the reasonableness of the rate.

There are other objections to the order which I think are worthy of consideration, but I have not the time, nor do I think the necessities of the case require that I pursue the inquiry further. In passing, I will say that I fully appreciate the difficulties that confront a rate-making body when it attempts to determine the cost to a carrier of hauling a single commodity. Owing to the many different elements that enter into such cost, which are common to the entire traffic and which at best can only be approximately apportioned, there is no rule by which it can be definitely ascertained. I appreciate also that the record discloses that the members of the department gave to the consideration of the question much earnest thought and careful consideration; but I feel that they have considered matters that ought not to have been considered, and have excluded others that ought to have been included, and for this reason alone I conclude that error has entered into their order.

In my opinion, the judgment appealed from should be reversed and the cause remanded to the department for further consideration.

MAIN, C. J., and MACKINTOSH, J., concur with FULLERTON, J.