PUGET SOUND TRACTION, LIGHT & POWER CO. v. REYNOLDS et al.

(District Court, W. D. Washington, N. D.    April 28, 1915.)

No. 60.

1. CONSTITUTIONAL LAW ⊜121—IMPAIRING OBLIGATION OF "CONTRACT."

A city ordinance may constitute a "contract," within the constitutional provision against impairing the obligation of contracts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 285, 304–311, 342–348; Dec. Dig. ⊜121.

For other definitions, see Words and Phrases, First and Second Series, Contract.]

2. MUNICIPAL CORPORATIONS ⊜593—FRANCHISES—SURRENDER OF POLICE POWER.

A municipal corporation cannot barter away the police power of the state, by unalterably fixing rates and fares during the life of a street railway franchise, unless specifically and expressly authorized so to do by the Legislature.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 904; Dec. Dig. ⊜593.]

3. STREET RAILROADS ⊜70—REGULATION BY PUBLIC SERVICE COMMISSION—STATUTORY PROVISIONS.

Public Service Commission Act Wash. March 18, 1911 (Laws 1911, p. 546) § 9, requires all charges by common carriers and all regulations to be just and reasonable, and requires all carriers to furnish adequate service, facilities, etc. Section 53 provides that, when the Public Service Commission shall find that the rates or fares of any carrier, or its regulations affecting such rates, are unreasonable, etc., it shall determine the reasonable rates or regulations to be observed, and fix them by order. An order of such Commission required a street car company to run through cars between certain points on certain lines, and to furnish sufficient cars to provide seats for substantially all passengers on certain lines. Held, that ample authority for the order was found in the statute.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 147½–149; Dec. Dig. ⊜70.]

4. STREET RAILROADS ⊜70—REGULATION BY PUBLIC SERVICE COMMISSION—VALIDITY OF ORDERS.

A street railway company may be required to furnish adequate facilities to the public, even though it suffers some incidental loss in complying therewith, as a public service corporation may always be required to perform its charter duties to the public.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 147½–149; Dec. Dig. ⊜70.]

5. CARRIERS ⊜12—REGULATION BY PUBLIC SERVICE COMMISSION—PRESUMPTIONS.

Where an order of a state Public Service Commission regulating rates to be charged by a street car company was made within the jurisdiction of such Commission, the rates are presumed reasonable and just until the contrary is made to appear.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⊜12.]

6. CARRIERS ⊜12—REGULATION BY PUBLIC SERVICE COMMISSION—VALIDITY OF ORDERS.

An order of a Public Service Commission, prescribing rates and fares to be charged on certain lines about 16 miles long by a street car company operating about 200 miles of railway, was not confiscatory, and de-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

prived the company of no property rights, though it compelled the operation of such lines at a loss, if the entire system was operated at a profit.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ⬤⟿12.]

7. CARRIERS ⬤⟿18—STREET RAILROADS ⬤⟿65½, New, vol. 16 Key-No. Series—REGULATION BY PUBLIC SERVICE COMMISSION—VALIDITY OF ORDERS.

Where an order of a state Public Service Commission regulating the rates and facilities of a street car company was neither confiscatory nor unreasonable, its enforcement could not be interfered with, though, as claimed, made in a spirit of retaliation because of the company's refusal to renew a certain traffic agreement.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⬤⟿18.]

8. STREET RAILROADS ⬤⟿70—REGULATION BY PUBLIC SERVICE COMMISSION—VALIDITY OF ORDERS — "EMERGENCY" — "EXTRAORDINARY" — "EMERGENCY CROWD"—"EXTRAORDINARY AND UNUSUAL OCCASIONS."

A street car company operated two railway lines about 8 miles long, which ran for a considerable distance through territory where there were few passengers, so that a majority of the passengers were carried 5 or 6 miles; such lines not paying expenses. For about two hours in the morning and in the evening of each day the cars were so crowded that from 30 to 40 per cent. of the passengers were compelled to stand for 5 or 6 miles, and on Sundays and summer afternoons the cars were crowded with persons going to the parks and beaches. The Public Service Commission ordered the company to furnish sufficient cars to provide seats for "the usual patronage"; the order providing that it need not provide seats for emergency crowds, nor on extraordinary occasions. Held that, as an "emergency" is an unforeseen occurrence or combination of circumstances calling for immediate action or remedy, or a pressing necessity, or an exigency, while "extraordinary" means beyond or out of the common order or method in use, uncommon, or rare, the order was unreasonable, as the crowds passing over the lines at the times mentioned were not "emergency crowds," nor were the occasions extraordinary or unusual, but to require the company to furnish seats at such times would be to require the impossible.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 147½–149; Dec. Dig. ⬤⟿70.

For other definitions, see Words and Phrases, First and Second Series, Emergency; Extraordinary.]

9. STREET RAILROADS ⬤⟿70—REGULATION BY PUBLIC SERVICE COMMISSION—VALIDITY OF ORDERS.

A definite and specific order for an increase in facilities to relieve the congestion during certain hours of the day would be reasonable.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 147½–149; Dec. Dig. ⬤⟿70.]

In Equity. Suit by the Puget Sound Traction, Light & Power Company against Charles A. Reynolds and others, constituting the Public Service Commission, and W. V. Tanner, Attorney General, of the State of Washington, to enjoin the enforcement of an order of such Commission. Injunction granted as against a part of the order.

James B. Howe and Hugh A. Tait, both of Seattle, Wash., for plaintiff.

W. V. Tanner and Scott Z. Henderson, both of Olympia, Wash., for defendants.

Before GILBERT, Circuit Judge, and RUDKIN and NETERER, District Judges.

RUDKIN, District Judge.  This suit was instituted by the plaintiff to restrain the defendants from enforcing an order of the Public Service Commission of the state of Washington.  The plaintiff is a citizen of the state of Massachusetts, and the defendants are the Public Service Commissioners and the Attorney General of the state of Washington, and citizens of that state.  The jurisdiction of this court is invoked on the ground of diversity of citizenship, and on the further ground that the order complained of impairs the obligation of certain contracts, and deprives the plaintiff of its property without due process of law, and denies to it the equal protection of the laws, in violation of the Constitution of the United States.  The order, is as follows:

"It is therefore ordered:

"(1) That the defendant company continue the operation of through service on the Ballard Beach line.

"(2) That the Alki Point and Fauntleroy Park lines be operated through the city of Seattle on First or Second avenue, as far north at least as Virginia street.

"(3) That the defendant company furnish sufficient cars to provide seats for substantially all persons using the Alki Point and Fauntleroy Park lines.

"It is understood that a substantial compliance shall be considered a sufficient compliance with this order directing the furnishing of seats for passengers on the Alki Point and Fauntleroy Park lines, the company not being required to provide for emergency crowds that might apply for seats, but shall provide seats at all times for the usual patronage of said lines, and shall so operate said lines at all times with sufficient cars to provide seats for all patrons, except on extraordinary and unusual occasions."

A brief statement of the case, as presented at the hearing of the application for an interlocutory injunction, is necessary to a proper understanding of the requirements of this order and the objections urged against it:

The plaintiff owns and operates a street railway system in the city of Seattle, and is the assignee of numerous franchises for street railways heretofore granted to its predecessors in interest by the city of Seattle, the city of West Seattle, the city of Ballard, and King county.  The Ballard Beach line, referred to in the order, is operated under Ordinance No. 1020 of the city of Ballard, entitled:

"An ordinance granting to the Seattle Electric Company, its successors and assigns, a franchise to construct, maintain and operate street railway extensions connecting with its present street railway system, and extending over certain parts of Railroad avenue and Fourth avenue, Crawford street and other streets, avenues and places in the city of Ballard."

For some time prior to the promulgation of the order in question the cars operated on the Ballard Beach line ran beyond the franchise limit and into the business district of the city of Seattle; but immediately before the promulgation of the order this service was discontinued, and passengers were required to transfer to other lines at the end of the franchise limit of the Ballard Beach line in order to reach the downtown districts.  The effect of the order was, therefore, to require

the plaintiff company to reinstate the through service on the Ballard Beach line.

The Alki Point line and the Fauntleroy Park line, each about eight miles in length, are operated under franchises heretofore granted to the predecessors in interest of the plaintiff by the city of Seattle. The northerly limit of these franchises is at or south of Yesler Way. For a period of two or three years prior to the date of the order in question the cars operating on these two lines ran north of Yesler Way on First or Second avenue to Virginia street, a distance of approximately a mile. Shortly prior to the promulgation of the order this through service was discontinued, and passengers going north of Yesler Way were required to transfer to other cars at that point, and a like transfer was required at the same point by passengers going in the opposite direction. The effect of the order was, therefore, to compel the company to reinstate the through service over these two lines north of Yesler Way on First or Second avenue as far as Virginia street. The uncontradicted testimony further shows that the two latter lines ran for a considerable distance over the tide flats, receiving and discharging but few passengers en route, so that a majority of the passengers are carried a distance of five or six miles before leaving the cars or reaching their destination. For this reason, among others, these two lines have never paid operating expenses, and perhaps never will, because the average haul is so long that the more cars operated and the more passengers carried the greater will be the loss to the company. It further appears, without substantial contradiction, that for about two hours in the morning and two hours in the evening of each day the cars on these two lines are so crowded that from 30 to 40 per cent. of the passengers are compelled to stand up for a period of 30 minutes or more while the cars are traveling a distance of five or six miles.

The franchise ordinances of the city of Ballard and the city of Seattle under which the three lines in question are operated provide, in substance, that the grantee, its successors and assigns, shall have the right at any and all times to make reasonable rules and regulations for the management and operation of the railway lines therein provided for, not inconsistent with the laws of the state or the charter and ordinances of the city; that the grantee shall have the right to charge a passenger fare of not exceeding five cents for one continuous passage for each passenger; that the grantee shall keep on sale at its main office and power station in the city of Seattle commutation tickets for $1 each, entitling the purchaser to 25 rides, but such tickets shall not be transferable, nor entitle the owner to a transfer, and the company is authorized to make reasonable rules and regulations to enforce the prohibition against transfers.

[1, 2] The first contention on the part of the plaintiff is that the order compels it to carry passengers on the Alki Point and Fauntleroy lines beyond the franchise limits of these lines, and in effect compels it to grant transfers on commutation tickets, in violation of the contract contained in the franchise ordinances. The order itself is silent as to rates or fares, but for the purposes of this case we will assume that it has the effect claimed for it. We are unable to yield assent,

however, to the proposition that these franchise ordinances create inviolable contracts between the municipality and the company protected by the contract clause of the federal Constitution. That a city ordinance may constitute a contract within the meaning of the Constitution is well settled; but it is equally well settled that a municipal corporation cannot barter away the police power of the state by unalterably fixing rates and fares during the life of a franchise, unless specifically and expressly authorized so to do by the supreme legislative authority in the state. Discussing this question in Home Telephone Co. v. Los Angeles, 211 U. S. 265, 272, 29 Sup. Ct. 50, 51 [53 L. Ed. 176], the court said:

"Did the city council have the power to enter into a contract fixing unalterably, during the term of the franchise, charges for telephone service, and disabling itself from exercising the charter power of regulation? If so, was such a contract in fact made? The first of these two questions calls for earlier consideration, for it is needless to consider whether a contract in fact was made until it is determined whether the authority to make the contract was vested in the city. The surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized. No other body than the supreme Legislature (in this case, the Legislature of the state) has the authority to make such a surrender, unless the authority is clearly delegated to it by the supreme Legislature. The general powers of a municipality, or of any other political subdivision of the state, are not sufficient. Specific authority for that purpose is required. This proposition is sustained by all the decisions of this court, which will be referred to hereafter, and we need not delay further upon this point."

Again:

"The facts in this case which seem to us material upon the questions of the authority of the city to contract for rates to be maintained during the term of the franchise are as follows: The charter gave to the council the power 'by ordinance * * * to regulate telephone service and the use of telephones within the city, * * * and to fix and determine the charges for telephones and telephone service and connections.' This is an ample authority to exercise the governmental power of regulating charges, but it is no authority to enter into a contract to abandon the governmental power itself. It speaks in words appropriate to describe the authority to exercise the governmental power, but entirely unfitted to describe the authority to contract. It authorizes command, but not agreement. Doubtless an agreement as to rates might be authorized by the Legislature to be made by ordinance. But the ordinance here described was not an ordinance to agree upon the charges, but an ordinance 'to fix and determine the charges.' It authorizes the exercise of the governmental power, and nothing else. We find no other provision in the charter which by any possibility can be held to authorize a contract upon this important and vital subject."

To the same effect, see Portland Ry. Light & Power Co. v. City of Portland (D. C.) 201 Fed. 119.

[3] The powers of the city of Seattle are no more specific or comprehensive in this regard than the powers conferred on the cities of Los Angeles and Portland in the cases cited, and little can be added to what has been said by Mr. Justice Moody and Judge Bean in these cases.

Section 9 of the Public Service Commission Act of March 18, 1911 (Laws 1911, page 546), provides that:

"All charges made for any service rendered or to be rendered in the transportation of persons or property, or in connection therewith, by any common

carrier, or by any two or more common carriers, shall be just, fair, reasonable and sufficient.

"Every common carrier shall construct, furnish, maintain and provide safe, adequate and sufficient service facilities, trackage, sidings, railroad connections, industrial and commercial spurs and equipment to enable it to promptly, expeditiously, safely and properly receive, transport and deliver all persons or property offered to or received by it for transportation, and to promote the safety, health, comfort and convenience of its patrons, employés and the public.

"All rules and regulations issued by any common carrier affecting or pertaining to the transportation of persons or property shall be just and reasonable."

Section 53 of the same act provides that:

"Whenever the Commission shall find, after a hearing had upon its own motion or upon complaint, as herein provided, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier for the transportation of persons or property within the state or in connection therewith, or that the regulations or practices of such common carrier affecting such rates are unjust, unreasonable, unjustly discriminatory, or unduly preferential, or in any wise in violation of the provisions of law, or that such rates, fares or charges are insufficient to yield a reasonable compensation for the service rendered, the commission shall determine the just, reasonable or sufficient rates, fares or charges, regulations or practices to be thereafter observed and enforced and shall fix the same by order as hereinafter provided.

"Whenever the Commission shall find, after such hearing, that the rules, regulations, practices, equipment, appliances, facilities or service of any such common carrier in respect to the transportation of persons or property are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the Commission shall determine the just, reasonable, safe, adequate, sufficient and proper rules, regulations, practices, equipment, appliances, facilities or service to be observed, furnished, constructed or enforced and be used in the transportation of persons and property by such common carrier, and fix the same by its order or rule as hereinafter provided."

Ample authority for the order of the Commission is found in these sections, and the franchise ordinances of the city of Seattle do not stand in the way of its exercise.

[4] The next contention of the plaintiff is that the order deprives it of its property without due process of law, and denies to it the equal protection of the laws. In this connection the order has a double aspect. First, it requires the street railway company to furnish adequate facilities to the public; and, second, it prescribes rates or fares for transportation. In the former aspect the order may be valid, even though the company suffers some incidental loss in complying therewith, because a public service corporation may always be required to perform its charter duties to the public. See Mo. Pac. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472, and cases there cited.

[5, 6] In its second aspect it may be conceded that the order is invalid if it amounts to a confiscation of the plaintiff's property, or denies to it a reasonable return on its invested capital; but the order was made within the acknowledged jurisdiction of the commission, and the rates established are presumed to be reasonable and just under all the authorities, state and federal, until the contrary is made to appear. Does the record in this case overcome or destroy this presumption? We think not. The company owns and operates about 200 miles of street railway in the city of Seattle, and the proof submitted is con-

fined to two of these lines only, aggregating about 16 miles in length. Conceding as we do that the order compels the company to operate these two lines at a loss, yet the entire system may be operated at a profit, and, if so, there is no confiscation of property or deprivation of property rights. In St. L. & San Francisco Railway Company v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, the Legislature of the state of Arkansas had prescribed a maximum rate of three cents per mile for each passenger carried by the railroads of that state, and imposed a penalty of $300 for each overcharge, payable to the passenger from whom the overcharge was exacted. In an action to recover this penalty the railway company defended on the ground that that portion of the railroad over which the plaintiff was carried was highly expensive to construct and maintain, and that the cost of transporting passengers over the same and the maintenance thereof exceeded the maximum rate fixed by law. Proof was offered tending to show:

That "the actual cost of carrying each passenger over that portion of defendant's railway in plaintiff's petition mentioned, and over all its railway therein referred to, did and does now exceed the sum of three cents per mile for each and every passenger so carried," and that "three cents per mile for the service rendered by defendant in carrying passengers, at the times in plaintiff's petition mentioned, over the line of railroad therein mentioned, was not reasonable compensation, and that no less than five cents per mile would be a reasonable sum."

In disposing of this defense and offer of proof the court said:

"It therefore appears that the allegations made and the evidence offered did not cover the company's railroad as an entirety even in the state of Arkansas, but were made in reference to that portion of the road originally belonging to the St. Louis, Arkansas & Texas Railway, and extending from the northern boundary of Arkansas to Fayetteville in said state. In this state of facts we agree with the views of the Supreme Court of Arkansas, as disclosed in the opinion contained in the record, and which were to the effect that the correct test was as to the effect of the act on the defendant's entire line, and not upon that part which was formerly a part of one of the consolidating roads; that the company cannot claim the right to earn a net profit from every mile, section, or other part into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such part would be unremunerative; that it would be practically impossible to ascertain in what proportion the several parts should share with others in the expenses and receipts in which they participated; and, finally, that to the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated as against all its legitimate expenses under the operation of the act within the limits of the state of Arkansas."

This language is peculiarly applicable to a street railway system. The passenger who travels five blocks ordinarily pays the same fare as the passenger who travels five miles. The one pays more than the service is worth, while the other pays less; but the long haul and the short haul are supposed to equalize each other in the end. And any attempt to fix street car fares so that each car or each line will bring a reasonable return to the owner would destroy all uniformity in rates and practically abrogate the power of regulation.

There is nothing in the recent case of Northern Pacific Railway Company v. North Dakota, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. Ed.

·——, decided March 8, 1915, in conflict with these views. In the latter case Mr. Justice Hughes, in delivering the opinion of the court, said:

"In St. Louis & San Francisco Railway Co. v. Gill, 156 U. S. 649 [15 Sup. Ct. 484, 39 L. Ed. 567], a statute fixing a maximum rate for passengers in the state of Arkansas was challenged, but the allegation and offer of proof that the rate would compel the carriage of passengers at a loss related only to a portion, or division, of the railroad, and not to the result of all the·traffic to which the rate in question applied. The holding that this was insufficient was in entire accord with the above-stated principle—that the rate-making power may be exercised in a practical way, and that the Legislature is not bound to assure a net profit from 'every mile, section, or other part into which the road might be divided.' 156 U. S. 665 [15 Sup. Ct. 484, 39 L. Ed. 567]. A passenger rate may apply generally throughout the state, and the effect of the rate must be considered with respect to the whole business governed by the rate."

[7] The complaint charges that there has been no physical valuation of the properties of the company, and that the order was made by the Commission in a spirit of retaliation, because of the refusal of the company to renew some traffic agreement with the port of Seattle; but these facts, if true, do not show, or tend to show, that the order is either confiscatory or unreasonable. The court is concerned with results rather than with motives or methods, and on the record presented we are of opinion that the enforcement of the order should not be interfered with, in so far as it relates merely to the running of cars on the Ballard Beach, Alki Point, and Fauntleroy Park lines beyond the franchise limits of these lines.

[8, 9] We feel constrained to hold, however, that so much of the order as requires the furnishing of seats for all passengers on the Alki Point and Fauntleroy Park lines is unreasonable and void, in view of the severe penalties imposed by law for failure to comply therewith. The order requires the company to furnish seats for "substantially all persons using the Alki Point and Fauntleroy Park lines," and provides that "a substantial compliance" with the order shall be deemed a sufficient compliance; that the company shall furnish seats at all times for "the usual patronage of said lines," and excepts only "emergency crowds" and "extraordinary and unusual occasions." Webster defines "emergency" as "an unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency." The same authority defines "extraordinary" as "beyond or out of the common order or method; not usual; uncommon; rare."

The crowds which pass over these two lines mornings and evenings, and the thousands that flock to the parks and beaches on Sundays and summer afternoons are neither emergency crowds, nor are the occasions extraordinary or unusual, and to require the company to furnish cars and seats for all who present themselves for transportation over these single-track railways, eight miles in length, is to require the impossible. We do not underestimate the difficulties which confront the commission in its efforts to compel the company to furnish adequate facilities, nor do we overstate the difficulties which confront the company in its efforts to furnish these facilities. The furnishing of seats for passengers on street railways is an unsolved problem, and

perhaps will remain so as long as a considerable part of the population is habitually attracted in the same direction at the same time in pursuit of business or pleasure. The matter is not wholly beyond regulation and control, however. If, as appears in this case, one-third of the passengers are without seats during certain hours of the day, an increase in facilities to that extent during these hours will, in a large measure, relieve the congestion. Such an order or regulation can be made definite and specific, and the company can reasonably comply therewith; but to compel it to furnish cars and seats at all times and on all ordinary occasions for all who may present themselves for transportation, as already stated, is an unreasonable requirement, and one to which no transportation company can conform. This conclusion finds ample support in the record, and is supported by facts and conditions within the common knowledge of all, of which a court may well take judicial notice.

To this extent the enforcement of the order will be enjoined, but in all other respects the application for an interlocutory injunction is denied.