## CITY OF SEYMOUR et al. v. TEXAS ELECTRIC SERVICE CO.

### No. 6537.

Circuit Court of Appeals, Fifth Circuit.
Aug. 1, 1933.

Rehearing Denied Aug. 28, 1933.

J. W. Gormley, of Dallas, Tex., and J. A. Wheat, of Seymour, Tex. (Poppenhusen, Johnston, Thompson & Cole, of Chicago, Ill., and Touchstone, Wight, Gormley & Price, of Dallas, Tex., of counsel), for appellants.

R. K. Hanger, Mark McMahon and Warren Scarborough, all of Fort Worth, Tex., Charles L. Black, of Austin, Tex., and Joe A. Worsham, of Dallas, Tex., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This appeal brings up for review on a record which, though voluminous, presents no conflict of fact, a decree enjoining the enforcement of minimum rate ordinances passed by the city council to put an end to a destructive rate war which, begun by the municipal plant, was joined in with determined vigor by appellee. These are the facts. Prior to what appellee regards as the intrusion into its local Eden of Fairbanks, Morse & Co., a seller of machinery and appliances, appellee operating from a central distributing system furnishing light and power to more than 65 communities in the state of Texas, was the sole distributor of electrical energy to the citizens and the city of Seymour. Urged thereto by Fairbanks, Morse & Co., and over the prolonged and bitter opposition of appellee [Fairbanks,

Morse v. Texas Electric Service Co. (C. C. A.) 32 F.(2d) 696; Fairbanks, Morse v. Texas Electric Service (C. C. A.) 63 F.(2d) 702] the city of Seymour in 1928, acting through its mayor and city council, entered into a contract with Fairbanks, Morse & Co., as allowed by statute, for the construction on credit alone, of a municipal light and power plant, to cost in excess of $125,000, and to be paid for not out of the general revenues, but entirely out of the revenues from the plant. The contract executed, the city officials at once began to solicit appellee's customers to make contracts with the municipal plant. Appealing to their prejudices, their civic pride, and their self-interest, they sought to dissatisfy them with appellee's service, promised lower taxes and a 10 per cent. reduction in light and power rates, and generally foretold that the establishment of their plant would immediately usher in a municipal millennium. So successful were these efforts, that about 350, more than half of appellee's customers, contracted to, and when the municipal plant was finished did, switch to that plant.

There are in the town of Seymour not over 650 potential customers, enough to insure a fair return for one of the plants, but not enough to insure such return for two. Faced with the present loss of half of its customers, and the prospect of losing the rest, appellee resolutely advanced upon the municipal plant to join battle with it on its own terms. Meeting reduction with reduction, it put into effect rates 10 per cent. lower than those its rival had inaugurated.

Appellee frankly admitted that the rates it thus instituted were not rates on which either it or the city could earn a fair return on the capital invested, but competitive rates; that is, rates put in not only to hold the business it had, but to draw back to it the municipal customers. The purely competitive character of these rates was emphasized by the fact that the rates in other communities served by appellee remained the same as those which appellee had had in force in Seymour before the rate war was begun there. This resolute and determined offensive making it clear that appellee was prepared for and willing to enter upon a finish fight, brought sharply home to the city and to Fairbanks, Morse a realization of what the result would be if the fight were further joined on these terms. They commenced to see that the city, the nominal owner of the plant, might not only come off second best in such a contest, but, unable to obtain sufficient revenues from the plant to pay the charges on it, might have to turn it back to its constructor, Fairbanks, Morse. Struck with dismay by this prospect, the city council, taking second thought, decided to abandon the contracts with its citizens which it had obtained before the rate war began, and to invoke instead the regulatory powers conferred upon it by law. It accordingly enacted ordinances fixing minimum rates below which neither the municipal nor the private plant could cut, providing in the ordinances, "The above rates are meant to be minimum rates fixed, any utility being authorized to fix a maximum in accordance with their desires." The rates thus fixed were substantially those it had contracted with its citizens to put in, 10 per cent. below the rates appellee had been charging before the municipal plant was erected, and 10 per cent. above the retaliatory rates appellee had put in, to meet the municipal cut.

Upon the passage of these ordinances, appellee, insisting that the city council was without power to pass minimum rate ordinances, and that the Fourteenth Amendment to the Constitution guaranteed to it, under the circumstances of this case, the right to carry on a competitive war to the knife, the knife to the hilt, sought first in the state court, and later in the federal court, to restrain their enforcement.

The grounds urged against the ordinances below were substantially the same as those urged here. These are: That the only power to regulate conferred on the city council by the state is the power to protect consumers from immediate and direct overcharges; that the power is exhausted in the establishment of a "fair return" rate, and that since the rates established are confessedly not "fair return" rates, the ordinances are void. That the power to regulate does not extend to protecting customers from the results of rate wars which, destroying competition, establish monopoly. That even if it be considered that the state has granted city councils, in proper cases, that is, cases where there is enough business for both, power to regulate competition between utilities by fixing minimum rates, this is not such a case; for here, the city having installed a municipal plant in competition with appellee in a community where there are not enough users to sustain both, it is unreasonable and unjust to prevent appellee from using, in the competitive struggle for existence which the city has forced upon it, the effective weapon of rate cutting. It is argued that the fact

that the statutes of Texas authorizing cities to purchase light plants on the sole credit of the plant, to be paid for from the returns of the business, provide that rates must be fixed adequate to insure payment in accordance with the construction contract, makes it clear that it was intended by the Legislature that rates for municipal plants were to be fixed upon different considerations from those governing the fixing of rates for utilities privately owned. That in this state of the law an ordinance fixing the minimum rate at a figure which the city found necessary to obtain the return required to pay the plant out, while effective as to the city, could not be effective as a rate ordinance as to privately owned utilities, and further that the fact that the city has an inchoate interest in the plant and will own it if and when it is paid out, disqualified the members of its council to fix, by ordinance, the conditions under which competition between the municipal plant and appellee should go on. Finally, it is said that if the view that these ordinances are invalid under the laws of the state of Texas is a mistaken one, they are invalid under the Constitution and laws of the United States.

The District Judge took appellee's view of it. He thought with Judge Bourquin, in Great Northern Utilities Co. v. Public Service Comm., 52 F.(2d) 802, since reversed 289 U. S. 130, 53 S. Ct. 546, 77 L. Ed. 1080, that having cried "Lay on" the city could not by ordinance cry "Hold—enough," but must fight on to the bitter end.

■ We do not think he was right. It must be admitted, however, that on its face there is much of poetic justice in the view the District Judge took. There is strong meat in the doctrine "Who draws the sword shall perish by the sword," and if the only untoward result of the controversy were to be that Fairbanks, saddled with the plant, would find itself hoist on its own petard, there might be no tears to shed. If, in short, this were only a private war between Fairbanks, Morse and the Texas Electric Company, the court might well stay the city from thrusting on Fairbanks' side. Such a view of the situation is, however, too much foreshortened. The larger, the truer view, though the prime combatants seem at times to have lost sight of it, is that there is a cause at stake, the cause of public service, the importance of which far transcends the failure or success in the lists of either champion. This cause it is the business and function of rate regulation to serve. Such regu-

lation is intended to, it should, supplant wasteful competition.[1]

Though cities have no inherent power of rate regulation, and they must find it in statutes conferring the power, when it has been granted to them as it has been in Texas, they may exercise it fully. McQuillen, Municipal Corporations (2d Ed.) §§ 1874, 1875, 1877; Pond, Public Utilities (4th Ed.) § 536; State v. Sheboygan, 111 Wis. 23, 86 N. W. 657.

■ Viewing the matter in this light, we think it cannot be gainsaid that it was not only the right, but the duty of the council to put a stop to the contest before its ruthlessness had ruined one or both of the plants. We think, too, that in doing so, on the basis of fixing the same minimum for each plant, it acted justly and well within its powers. Public Service Comm. v. Gt. Northern Utilities, 289 U. S. 130, 53 S. Ct. 546, 77 L. Ed. 1080; Community Co. v. Natural Gas Co. (Tex. Civ. App.) 34 S.W.(2d) 900; Farmersville v. Texas-Louisiana Power Co. (Tex. Civ. App.) 55 S.W.(2d) 195; City of Uvalde v. Uvalde Electric & Ice Co. (Tex. Com. App.) 250 S. W. 140; Town of Mapleton v. Iowa Public Service Comm., 209 Iowa, 400, 223 N. W. 476, 68 A. L. R. 993; Economic Gas Co. v. City of Los Angeles, 168 Cal. 448, 143 P. 717, Ann. Cas. 1916A, 931; Pinney v. Los Angeles Gas Corp., 168 Cal. 12, 141 P. 620, L. R. A. 1915C, 282, Ann. Cas. 1915D, 471; Logan City v. Public Utilities, 72 Utah, 536, 271 P. 961; Springfield Gas & Elec. Co. v. City of Springfield, 292 Ill. 236, 126 N. E. 739, 18 A. L. R. 929; State Public Utilities Commission v. Springfield Gas & Electric Co., 291 Ill. 209, 125 N. E. 891; Coleman Gas & Oil Co. v. Santa Anna Gas Co. (Tex. Civ. App.) 58 S.W.(2d) 540.

The ordinances under attack here have no function, no effect, but to prevent lethal rate cutting. They leave appellee free, except as bound by the statute of Texas to do no injustice, to fix its own rates at such figure above the minimum as it may desire.

The cases we have cited are authority for more power in the council than the city contends for here. The Texas cases cited hold that the authority conferred by statute to

---

[1] "The theory of the regulation of municipal public utilities by the state is to avoid competition, which is now generally recognized as a needless economic waste and an entirely insufficient method of securing the necessary regulation and control. Under this method the state takes the place of competition, and furnishes the regulation which competition cannot give." Pond, Public Utilities (4th Ed.) § 901.

regulate is authority not only to fix the same minimum rates, but the same absolute rates for municipally and privately owned utilities. Some of the cases cited from other states go even further. They hold that municipally owned plants, though in competition with private utilities, may have their own rates fixed at figures greatly lower than those its competitor is required to charge. In Springfield Gas & Electric Co. v. City of Springfield, 257 U. S. 70, 42 S. Ct. 24, 66 L. Ed. 131, it was held that the existence of this disparity in rates did not make out a case under the Constitution for the complaining utility, either because of the unequal competition it was put to, or on the ground that the city council was rendered incompetent by the city's ownership of a competing plant to justly fix the rates, it should charge. The reason for this is not far to seek. It is, that though in owning and operating a utility plant a city acts not in a governmental but in a proprietary capacity, when the council, exerting the power to regulate, comes to fix rates it represents not the city, as proprietor, but the state, as regulator. It exerts not the contractual power of the city, but the sovereign power of the state. Spring Valley Water-Works v. Schottler, 110 U. S. 354, 4 S. Ct. 48, 28 L. Ed. 173; Puget Sound v. Reynolds (D. C.) 223 F. 371; McQuillan on Municipal Corporations (2d Ed.) §§ 1874, 1875, 1877; Benwood v. Public Service Comm., 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261; Sumter Gas & Power Co. v. City of Sumter (C. C. A.) 283 F. 931, 935; Winchester v. Winchester Waterworks, 251 U. S. 193, 40 S. Ct. 123, 64 L. Ed. 221. We think it beyond question then that the ordinances complained of, passed for the purpose of putting an end to an internecine war, were within the power of the city to pass, that they were just ordinances, and that there is no equity in plaintiff's suit unless appellee's secondary contention that the statute the city relies on, article 1119, Rev. St. Tex. 1925 [2] delegates the state's authority only as to fixing rates for lighting, and the schedules for heating, cooking, refrigera-

tion, power, and other uses than lighting are so intermingled with the light schedules as to render the whole ordinance void.

■ This position is put to an extent on the ground that power charges may not, to the same extent that light charges are, be made the subject of municipal regulation. We think the law is settled otherwise. Pinney & Boyle Co. v. Los Angeles Gas & Elec. Corp., 168 Cal. 12, 141 P. 620, L. R. A. 1915C, 282, Ann. Cas. 1915D, 471. It is, however, mainly grounded on the undoubted rule of law that a municipality has no inherent rate-making power; that the power of the state to regulate municipal public utilities, which includes the power to fix and control the rates to be charged, belongs to the state in its sovereign capacity, and can be delegated to municipal corporations only in express terms or by clear implication.

■ The power to regulate rates cannot be claimed by a municipality under the general welfare clause, or under its powers to grant franchises in and regulate the use of streets. The right to contract for rates and the right to exert the police power in regulating them are entirely distinct powers. The first, the city has under its general powers; the latter, it has only when a statute has conferred it. 19 R. C. L. § 161; 9 R. C. L. § 6; McQuillan on Municipal Corporations (2d Ed.) §§ 1874, 1875, 1877; Woodburn v. Public Service Comm., 82 Or. 114, 161 P. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996; Benwood v. Public Service Comm., 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261; Lewisville Nat. Gas v. State, 135 Ind. 49, 34 N. E. 702, 21 L. R. A. 734; Puget Sound v. Reynolds (D. C.) 223 F. 371; City of St. Mary's v. Hope Nat. Gas Co., 71 W. Va. 76, 76 S. E. 841, 43 L. R. A. (N. S.) 994; Bluefield Water Works v. City of Bluefield, 69 W. Va. 1, 70 S. E. 772, 33 L. R. A. (N. S.) 759; Minneapolis General Electric Co. v. Minneapolis (C. C.) 194 F. 215; Gainesville Gas & Elec. Power Co. v. Gainesville, 63 Fla. 425, 58 So. 785; Logansport v. Public Service Comm., 202 Ind. 523, 177 N. E. 249, 76 A. L. R. 838; Sumter Gas & Power Co. v. Sumter (C. C. A.) 283 F. 931, 935; Ball v. Texarkana (Tex. Civ. App.) 127 S. W. 1068, 1069; Foster v. City of Waco, 113 Tex. 352, 255 S. W. 1104; City of Kalamazoo v. Titus, 208 Mich. 252, 175 N. W. 480.

■ Advancing under this standard, appellee argues that the authority in the city council to regulate rates other than for lighting is nonexistent. It points to the fact that

[2] Art. 1119 (1018). "Rates prescribed, etc.—The governing body of all cities and towns in this State of over two thousand population, incorporated under the general laws thereof, shall have the power to regulate, by ordinance, the rates and compensation to be charged by all water, gas, light and sewer companies, corporations or persons using the streets and public grounds of said city or town, and engaged in furnishing water, gas, light or sewerage service to the public, and also to prescribe rules and regulations under which such commodities shall be furnished, and service rendered, and to fix penalties to enforce such charges, rules and regulations."

article 1119 as originally enacted in 1907, and as reenacted in 1931 (Acts 1931, c. 226, § 1 [Vernon's Ann. Civ. St. art. 1119]), while providing that the governing bodies of cities shall have the power to regulate "the rates and compensation to be charged by all water, gas [telephone companies added in 1931], light and sewer companies, corporations or persons using the streets and public grounds of said city or town, and engaged in furnishing water, gas, light or sewerage service to the public," nowhere makes mention of electrical energy furnished for uses, other than for lighting or the regulation of charges for such energy furnished. It points further as indicating the legislative intention to withhold this power from the governing bodies of cities, to the generality of articles 1125 and 1131 providing for judicial regulation, the first gives district courts authority, when the public interest requires it, to fix and establish rates for the services and products of all public utility corporations; the second provides, in part: "The public utilities included within the meaning of this subdivision are defined to be water companies furnishing water to the public, gas companies furnishing gas to the public, electric light or power companies furnishing light or power to the public; telephone companies furnishing telephones to the public; sewerage companies conducting sewerage for the public." It points also to the fact that article 1108 authorizing cities to construct and operate water, sewerage, and gas or electric light systems authorizes them in terms to sell water, electric light or power, and sewer privileges to persons outside of the towns.

Appellants, opposing, argue that article 1119 in itself, and especially when taken with the other statutes, shows that in declaring that the governing bodies of cities shall have power to regulate by ordinance the rates and compensation to be charged by all water, gas, light, and sewer companies, the Legislature intended to describe not the uses to be made of the products furnished, but the companies furnishing them, and to confer upon city councils full power to regulate the charges for the products which these companies furnished to the public. They point, as demonstrating that the words "light company" were used comprehensively to designate companies furnishing electrical energy in contrast to those furnishing gas and water, to the fact that the same article 1108, which authorizes cities to sell electric light or power, refers to the plants owned and to be owned, not as electric light and power plants, but sometimes merely as "electric lights" and sometimes as "electric light systems," and that in articles 1111 and 1113 (as amended [Vernon's Ann. Civ. St. arts. 1111, 1113]), authorizing cities to mortgage their plants, the words used are not "light and power systems" or even "electric light systems," but merely "light systems."

As conclusive that the words used throughout the statute, "light companies," "light systems," "electric lights," "electric light systems," "light" were used to designate and describe generally electric companies and the electrical energy they furnished, and not the limited use of such energy for lighting purposes, they point to the fact that gas and water companies are identified by their products, and not by the uses to be made of them. They say that unless this broad meaning is given to it, the statute would be ineffective to distinguish gas from electric systems, for both systems furnish energy for lighting as well as for cooking, heating, and other purposes.

We think it clear that appellants are right. A reading of the statutes in the light of the purposes intended makes it plain that no such result as appellee contends for was intended by the Legislature, and that we ought not, unless we are compelled to do so, find a case of omission here, the result of legislative inadvertence. Appellee concedes that no state court in Texas has ever given to the article the restrictive construction it contends for. No instance is cited either in the books or in the record of such a contention having heretofore been made. It is most significant that in the long period of its operation this claimed statutory defect has not before been discovered. It is significant, too, that in 1931, when the act was amended, the same language was used again.

We think the construction of the statute that the power it conferred upon city councils was limited to the regulation of rates for light, and did not extend to the regulation of rates for cooking, heating, power, and other uses, is a strained and artificial one. We reject it. The statute contains no such limitation in terms. We think in view of the generality of the words of reference used, the bizarre results which would follow, and the long practical construction to the contrary, it would be unreasonable to now imply it. We think that the power over electric companies to fully regulate their rates, practices, and charges in the public service, has been expressly granted; but that if it has not, it

certainly arises by reasonable and necessary implication from the terms of the grant.

The judgment is reversed and the cause remanded, with directions to dismiss the bill for want of equity.